UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 07-10058-CIV-MOORE/SIMONTON

UNITED STATES OF AMERICA,

    Plaintiff,

v.

STEPHEN ROBERT BARLOW, et al.,

    Defendants.
_____/

## ORDER

Presently pending before the Court are Defendants' Motions to Compel (DE ## 21, 27, 28, 31), and Plaintiff's Cross-Motion for Protective Order (DE # 24). These motions are fully briefed (DE ## 23, 25-26, 33-35, 39, 40, 42), and all pretrial discovery matters have been referred to the undersigned Magistrate Judge (DE # 12). The rulings set forth below are based upon a careful review of a record as a whole, including the arguments made by counsel at the July 30, 2008 hearing on these discovery motions.

    I.    <u>FACTUAL HISTORY</u>

The following recital of facts is drawn from the government's Complaint, which for the purposes of this Order, are either presumed to be true, unless otherwise noted. On November 16, 2003, in Key West, Florida, while operating his yacht, the "Non-Compete," Stephen Robert Barlow ran aground and damaged 141.07 square meters of seagrass bottom cover (DE # 1 at ¶ 14-16). The Florida Keys have been designated a national marine sanctuary (DE # 1 at ¶ 13) and the seagrass beds constitute a "sanctuary resource" under the National Marine Sanctuaries Act ("NMSA"), 16 U.S.C. §§ 1431, *et seq.* (DE # 1 at ¶ 14). The government, therefore, filed this civil action against Mr. Barlow, *in personam,* and against the Non-Compete, *in rem,* to recover the value of

damage caused to the seagrass beds, plus interest, as it is permitted to do pursuant to the NMSA (DE # 1).[1]

## II. STATUTORY BACKGROUND

The NMSA provides that

> Any person who destroys, causes the loss of, or injures any sanctuary resource is liable to the United States equal to the sum of–
>
>> (A) the amount of response costs and damages resulting from the destruction, loss, or injury; and
>>
>> (B) interest on that amount.

16 U.S.C. § 1443(a).[2] Thus, the total amount of "response costs" and "damages" establish the extent of civil liability under the NMSA. In this case, however, the government only asserts a claim for damages under the NMSA, but not for response costs.[3]

"Damages," as that term is used in the NMSA, consists of:

> (A) compensation for–

---

[1] An initial assessment of the damages conducted in July 2004 (including restoration costs) totaled $104,406.14 (DE # 21 at ¶ 3). A subsequent damage calculation in October 2005 found $94,145 in damages (DE # 23 at 6). A later assessment conducted in December 2007, after the commencement of this litigation, found $597,260.98 in damages (including restoration costs) (DE # 21 at ¶ 4).

[2] A "sanctuary resource" is "any living or nonliving resource of a national marine sanctuary that contributes to the conservation, recreational, ecological, historical, educational, cultural, archeological, scientific, or aesthetic value of the sanctuary

[3] "Response costs" under the NMSA are defined as the costs of actions taken or authorized by the Secretary [of Commerce] to minimize destruction or loss of, or injury to, sanctuary resources, or to minimize the imminent risks of such destruction, loss or injury. 16 U.S.C. § 1432(7). The Secretary of Commerce, moreover, is permitted to undertake or authorize all necessary actions to prevent or minimize the destruction or loss of, or injury to, sanctuary resources, or to minimize the imminent risk of such destruction, loss or injury. 16 U.S.C. § 1443(b)(1).

2

>> (i)(I) the cost of replacing, restoring, or acquiring the equivalent of a sanctuary resource; and
>
>> (II) the value of the lost use of a sanctuary resource pending its restoration or replacement or the acquisition of an equivalent sanctuary resource; or
>
>> (ii) the value of a sanctuary resource if the sanctuary resource cannot be restored or replaced or if the equivalent of such resource cannot be acquired;
>
> (B) the cost of damage assessments under section 1443(b)(2) of this title; and
>
> (C) the reasonable cost of monitoring appropriate to the injured, restored, or replaced resources;
>
> (D) the cost of curation and conservation of archeological, historical, and cultural sanctuary resources;
>
> (E) the cost of enforcement actions undertaken by the Secretary [of Commerce] in response to the destruction or loss of, or injury to, a sanctuary resource.

16 U.S.C. § 1432(6).

Finally, the NMSA sets forth the exclusive statutory defenses to civil liability under the Act, that apply in instances where

> (A) the destruction or loss of, or injury to, the sanctuary resource was caused solely by an act of God, an act of war, or an act or omission of a third party, and the person acted with due care;
>
> (B) the destruction, loss, or injury was caused by an activity authorized by Federal or State law; or
>
> (C) the destruction, loss, or in jury was negligible.

16 U.S.C. § 1443(a)(3).  *See Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 943-944 & n.7 (11th Cir. 2001) (construing analogous Park Resource Protection Act defenses as exclusive and citing cases involving the exclusivity of statutory defenses in the context of other analogous statutes).

3

### III.     DEFENDANTS' MOTION TO COMPEL BETTER RESPONSES (DE # 21) AND PLAINTIFF'S CROSS-MOTION FOR PROTECTIVE ORDER (DE # 24)

#### A.     Background

The Motion to Compel Better Responses to Defendants' Discovery Requests ("First Motion to Compel") (DE # 21), concerns Requests for Production 5-7, as well as Interrogatories 1-2. The requests for production asked the government to provide all of its files and records relating to prior groundings in the Florida Keys National Marine Sanctuary between January 1, 1999 and the present. The government objected to these discovery requests on the grounds that they were overbroad and irrelevant. Later, Defendants agreed to limit their requests to encompass "only damage assessments and restoration plans," (DE # 21 at 3). In addition, in interrogatory No. 1, Defendants asked the government to provide details concerning those prior groundings; and, in Interrogatory No. 2, Defendants asked the government to state, in detail, why no efforts have been made to conduct a post-injury response to the damage seagrass beds (Interrogatory No. 2). The government sought a protective order relieving it of the obligation to respond to these requests for production and interrogatories, as well as from responding to any further inquiry related to prior groundings, including any questions on that subject during the Rule 30(b)(6) deposition of the government's representative (DE # 24).

#### B.     The Parties' Positions

Defendants begin by pointing out that the government's initial damage assessment in July 2004 indicated approximately $100,000 worth of damages to the seagrass beds, but by the time of the government's December 2007 damage assessment, the extent of the damage ballooned to nearly $600,000. Defendants argue that the

government unreasonably and imprudently failed to take emergency response measures immediately after the grounding in order to minimize the amount of damage to the seagrass beds.  Defendants, in their supplemental memorandum, suggest that the private contractors who drive the restoration projects have a private pecuniary interest in delaying restoration efforts both to ensure that they do not expend any resources until the government has obtained a judgment or settlement against the responsible party; and to ensure that the damage worsens, which increases the amount that they can bill for repairs.  Moreover, Defendants predict that the contractors, consistent with past practice, will revise their assessment to eliminate the need for carrying out the costly restoration after the government manages to extract an inflated judgment or settlement against Defendants (DE # 33).  In sum, Defendants allege that, in this case, "attorneys and / or number crunchers, rather than marine biologists," determined whether to take emergency measures to allay further injury to the grounding site; that those decisions were driven by private pecuniary interests (DE # 33 at 3-4); and, in light of all the above, Defendants should be permitted to discover information to flesh out its argument that the government's recovery should be limited based on a finding that the government's own inaction constitutes a superseding cause of the damages, or calls for the application of the doctrine of laches (DE # 21).  Defendants add that the requested discovery is also necessary in order to impeach the government's expert witness (DE # 24 at ¶ 7).  Finally, Defendants say that the government's calculation of damages is subject to rebuttal by their expert witness, who will challenge the reasonableness of the damage estimates given the failure to mitigate the injury to the seagrass beds (DE # 24).

The government insists that the NMSA is a strict liability statute and that the three statutory defenses to liability – which are only applicable if the damages are caused

*solely* by an act of God, an act of war, or an act of omission of a third party; if the damages are caused by a legally authorized activity, or if the damages are negligible – must be construed narrowly.  16 U.S.C. § 1443(a)(3); *see also Tug Allie-B, Inc. v. United States*, 273 F.3d 936, 943-44 (11th Cir. 2001).  The government contends that none of the statutory defenses are available here and, therefore, Defendants' discovery requests are irrelevant and not subject to production (DE # 23 at 8-9).  The government, in its Supplemental Response, "categorically denies the assertions made by defendants about the manner in which it manages the [marine sanctuary] program," and, in any event, Defendant's allegations concerning the involvement of contractors in its restoration process "change nothing" because the manner in which the program is operated does not constitute an affirmative defense under the statute (DE # 35 at 2-3).

    C.    <u>Analysis</u>

Defendants crystallized their position at the July 30, 2008 hearing.  First, they acknowledged the government's point that the facts of this case either do not give rise to a statutory defense under the NMSA or that the materials requested are not relevant to prove any such defense.  Defendants argue that they are nevertheless entitled to challenge the reasonableness of the amount of damage and response costs as calculated by the government, and that their discovery requests are germane to this limited purpose.  For example, they argued that they are permitted to challenge the government's expenditures for monitoring the grounding site at issue in this case if the government spent far less money monitoring similar grounding sites in the past.  Second, Defendants agreed to focus the geographic scope to within one nautical mile of

the grounding site alleged by the government.[4]

The undersigned finds that the initial request was overbroad, and the information about unrelated groundings throughout the Florida Keys Sanctuary is not likely to lead to relevant evidence. However, within these new limits, and for the reasons stated at the hearing, the undersigned finds that discovery is appropriate for the purpose of contesting the damages sought by the government. The government has not argued that this limited request is unduly burdensome. It appears that there are only ten groundings, and that damage assessments and/or restoration plans may not have been prepared with respect to all groundings; in addition, the government stated that no assessments would have been made where there was no reported grounding. Thus, ten is the outer limit.

Therefore, the government shall produce any damage assessments and restoration plans from January 1, 1999 to the present for any injured areas within one nautical mile of the grounding site alleged by the government.

IV.   **DEFENDANTS' MOTION TO COMPEL DISCOVERY AND MOTION FOR SANCTIONS (DE # 27)**

In their Motion to Compel Discovery and for Sanctions (DE # 27), Defendants sought three categories of discovery, including a document identified in the government's privilege log as "MINI 312 Minutes Dated 6/21/2004;" historical aerial photographs of the injury site; and emails between the government and its expert

---

[4] The undersigned notes that the parties contest the exact location of the grounding site. The government's alleged grounding site is simply selected as a fixed point from which to calculate the geographic scope of groundings that will give rise to the government's discovery obligations, and is not intended to express any judgment on the merits of the parties' underlying dispute concerning the location of the alleged grounding.

7

witnesses. In addition, Defendants request sanctions based on government counsel's conduct during the deposition of the government's Rule 30(b)(6) representative.

### A.   MINI 312 Minutes Dated 6/21/2004

The dispute over this document arose from a simple misunderstanding due to a transcription error, as chronicled in the parties' briefs (DE # 27 at 1-2; DE # 31 at 3; DE # 34 at 2; DE # 40 at 1-2). The parties confirmed at the July 30, 2008 hearing that they have resolved the confusion and that the government has fully complied with this request.

### B.   Aerial Photographs of the Injury Site

Defendants' confirmed on the record at the July 30, 2008 hearing that discovery dispute was also resolved by the parties. In short, the government agrees that it will produce any relevant aerial photographs that it finds, as well as provide Defendants with any copies of photographs it purchases from non-governmental sources (DE # 34 at 3).

### C.   Emails to the Government's Expert Witnesses

The parties agree that the government has produced the complete email correspondence files of its expert witnesses up to May 2, 2008. The government contends, however, that it is not required to produce any emails after that date because (1) the contents of those emails could not affect the substance of the experts' reports, which were completed and served by April 18, 2008; and (2) the experts are government employees who are on the "case team" that has assisted the government's counsel in preparing this case for trial and, therefore, the emails contain confidential and privileged materials that are not subject to discovery (DE # 34 at 4-5) (citing *Weaver v. Lexington Ins. Co.*, 2006 WL 3147655, at *1 (M.D. Fla. 2006)). Defendants reply that the opinions of the government's experts are being shaped by newly discovered evidence acquired after May 2, 2008 and the requested communications are relevant to support Defendants'

allegations that the government's experts are being coached by government counsel to "explain away . . . inconsistencies" in the government's case (DE # 40 at 4-5).

This case presents a difficult situation because the individuals who sent and received these emails are not only the expert witnesses in this case, but, as government employees designated as agency case managers for the present litigation, they are also the clients here. Nevertheless, these expert witnesses will testify at trial and the undersigned rejects the notion that they will be able to compartmentalize information they received after preparing their reports in such a way that they will not rely on such information when giving their testimony. *See* 2 Edna Selan Epstein, The Attorney-Client Privilege and the Work-Product Doctrine § VI.B.1 (5th ed. 2007). Because Defendants are entitled to discover the materials that inform the opposing experts' opinions and subsequent testimony, the government is required to turn over any substantive communications to or from its expert witnesses concerning the facts of this case regardless of when they took place in relation to the creation of any expert reports; and, in turn, the government shall supplement its privilege log if necessary and submit to the Court for *in camera* review any documents that it claims are privileged as relating only to case preparation.

D. Sanctions

Defendants have moved for sanctions based on the deposition conduct of government counsel during the Rule 30(b)(6) deposition of the government's representative, Mr. Stephen Werndli. Defendants argue that the alleged grounding did not occur at the location the government says it did, and that the way the grounding site was identified and marked is a vital issue in this case. According to Defendants, the government improperly interrupted Defendant's questioning to answer questions on

behalf of the witness regarding the "government's position" on the manner in which the grounding site was marked, such as who placed a stake in the grounding site, who documented its location, whether the stake was moved and at what time the vessel was removed (DE # 27 at 3-14). The government responds that Defendants failed to consult prior to filing the Motion for Sanctions, in contravention of the pre-filing notice requirements under S.D. Fla. L.R. 7.1.A.3 and Fed. R. Civ. P. 37(a); that Defendants obtained answers to its questions both during the deposition and a later re-deposition, which the government did not oppose. Even though Defendants argue that its Motion for Sanctions was based on the fact that government counsel answered questions posed to its Rule 30(b)(6) representative, but not based on the objections themselves, the government argued that the objections were reasonable, justified and not excessive. *See* Fed. R. Civ. P. 37 (DE # 39).

      The undersigned concludes that sanctions are not warranted in this instance. First, based upon the deposition excerpts provided by the parties, Defendants asked, and Mr. Werndli answered, numerous questions about the marking of the grounding site. Also, the conduct of government's counsel which Defendants claim is objectionable arose after it appeared the questioning was becoming repetitive; and the challenged conduct arose only after Defendants' counsel raised the questions in a manner that suggested he was asking for the government's litigation position, rather than the witness' knowledge of factual events. Moreover, the government readily agreed to schedule a continued 30(b)(6) deposition, in which Defendants were permitted to re-examine Mr. Werndli. While government counsel must state his deposition objections "concisely in a nonargumentative and nonsuggestive manner," Fed. R. Civ. P. 30(c)(2), his conduct in the course of this deposition was neither unreasonable nor egregious

and, therefore, undeserving of sanctions.

### V. DEFENDANTS' MOTION TO COMPEL PRODUCTION OF FIELD NOTES (DE # 28)

As Defendants clarified at the hearing, their Motion to Compel Production of Field Notes (DE # 28) consists of two components. First, they requested metadata from the government's electronic discovery materials, including the data from GPS locators. The government has agreed to produce this material and Defendants confirmed that this aspect of its request is now moot. Second, Defendants requested the complete set of field notes generated by investigators at the grounding site. Consistent with Defendants' request in their briefs, the government provided field notes that were not originally produced, but which Defendants requested after seeing them on a videotape recording of the initial damage assessment. At the hearing, Defendants stated that the testimony of a government witness during a subsequent deposition revealed that there is a reverse side to those field notes, which have not been produced. The government has agreed to produce the reverse side of the field notes, provided that it is able to find them, which it has tried to do, without success.

As the government concedes, Defendants are entitled to discover the reverse side of the field notes that were taken by investigators during the initial damage assessment. The government shall conduct a search for the requested documents and it shall produce an affidavit of its records custodian that sets forth, in detail, the steps that were taken to find all field notes, including the reverse side of the document described above, in the prior search and in the renewed search; and which states that all the responsive materials it has found have been produced.

### VI.     DEFENDANT'S MOTION TO COMPEL PRIVILEGE LOG (DE # 31)

Defendants also criticized the government's privilege log on a variety of grounds – including that it contained improper claims of privilege and that it identified certain documents as being generated on future dates – and argued that the sum of these shortcomings made the privilege log indecipherable (DE # 31 at ¶¶ 4-7).  At the July 30, 2008 hearing, the parties confirmed that some of these disputes had been resolved – including the government's explanation that some documents were dated incorrectly as a result of innocent transcription errors – and that any remaining disputed matters have been addressed in the context of this Court's ruling on other, more specific discovery matters.

### VII.    CONCLUSION

Based upon the foregoing, it is hereby

**ORDERED AND ADJUDGED** that Defendants' Motion to Compel Better Responses to Defendants' Discovery Requests (DE # 21) and Plaintiff's Cross-Motion for Protective Order (DE # 24) are **GRANTED IN PART AND DENIED IN PART**.  On or before August 11, 2008, the government shall serve all damage assessments and restoration plans created between January 1, 1999 and the present which are within the government's possession, custody or control and relate to any injured areas within one nautical mile of Defendants' grounding site as alleged by the government.  It is further

**ORDERED AND ADJUDGED** that Defendants' Motion to Compel Discovery Requests and Motion for Sanctions (DE # 27) is **GRANTED IN PART AND DENIED AS MOOT IN PART** as follows:

1.     Defendants' request for the document identified as "MINI 312 Minutes

Dated 6/21/2004" is **DENIED AS MOOT**.

2.     Defendants' request for historical aerial photographs of the injury site is **DENIED AS MOOT**.

3.     Defendants' request for the complete email files of the government's expert witnesses from May 2, 2008 to the present is **GRANTED**, in part. On or before August 11, 2008, the government shall produce all records within its possession, custody or control that reflect substantive communications to and from its expert witnesses concerning the facts of this case. If necessary, the government shall update its privilege log and deliver under seal to the chambers of the undersigned Magistrate Judge any documents subject to a claim of privilege for an *in camera* review.

4.     Defendants' request for sanctions based on the deposition conduct of the goverment's counsel is **DENIED**. It is further

**ORDERED AND ADJUDGED** that Defendants' Motion to Compel Production of Field Notes (DE # 28) is **GRANTED IN PART AND DENIED AS MOOT IN PART**. On or before August 11, 2008, the government shall file an affidavit of its records custodian. The affidavit shall confirm that the government has undertaken a diligent search for the complete set of field notes requested by Defendants; describe, in detail, how the search was conducted; and report that all responsive materials discovered in the government's renewed search have been provided to Defendants. It is finally

**ORDERED AND ADJUDGED** that Defendants' Motion to Compel Privilege Log (DE # 31) is **DENIED AS MOOT**.

**DONE AND ORDERED** in chambers, in Miami, Florida on August 1, 2008.

*Andrea M. Simonton*
_____
**ANDREA M. SIMONTON**
**UNITED STATES MAGISTRATE JUDGE**

Copies to:
The Honorable K. Michael Moore,
    United States District Judge
All counsel of record