IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 07-10058-CIV-MOORE/SIMONTON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

STEPHEN ROBERT BARLOW,
*in personam*, and the
M/V NON-COMPETE,
including her motor, apparel, tackle,
appurtenances, etc., *in rem*,

    Defendants,
_____/

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS CAUSE came before the Court upon Defendants' Motion for Summary Judgment as to Liability and Damages (dkt # 44) and Defendants' Motion to Strike Plaintiff's Cross-Motion for Summary Judgment (dkt # 69).

UPON CONSIDERATION of the Motions, the Responses, the pertinent portions of the record, and being otherwise fully advised in the premises, the Court enters the following Order.

**I.    BACKGROUND**

This case involves a claim for damages by Plaintiff United States of America (the "Government") for damage to sanctuary resources inflicted when a boat operated by Defendant Stephen Barlow ("Barlow") ran aground. On November 16, 2003, Barlow was operating the M/V Non-Compete, a fifty-two foot vessel. The vessel ran aground while traveling in the Florida Keys National Marine Sanctuary. Barlow called A & B Marina for assistance and A & B contacted Florida Keys Harbor Service. Within a short period of time, James Felton of Florida Keys Harbor Service arrived and used his vessel to pull the M/V Non-Compete off the grounding and towed it

back to port. Felton reported the grounding and the coordinates of the grounding to the Florida Fish and Wildlife Conservation Commission ("FWCC"). Felton also provided longitude and latitude coordinates in a disabled boat sheet report. However, it is unclear if the source of these coordinates was from a GPS on Felton's vessel or if the coordinates were obtained from the call for assistance that Barlow made to A & B Marina. Felton also marked the grounding location by placing a PVC stake at the stern of the M/V Non-Compete. The PVC stake was approximately 10 feet long and was white with the top 1 1/2 feet painted blue. The stake bore no identifiable markings that would permit identification of one particular PVC stake from another. The next day, FWCC Officer David Dipre ("Dipre") proceeded to the GPS coordinates reported by Felton and located a PVC stake within an injured area approximately 400 yards from the coordinates reported by Felton.

Approximately 8 months later, on July 7, 2004, a damage assessment team comprised of Kevin Kirsch ("Kirsch") and Sean Meehan ("Meehan") visited the location of the PVC stake but did not record the coordinates of the stake. The damage assessment team mapped the perimeter of the injured area and assessed the volume of displaced sediment. The team documented a "blowhole," or injured area, and a pair of propscars in a southwesterly inbound direction and an outbound injury to the east. The area of the injury was 141.07 square meters. The volume of excavated sediment was 27.88 meters with a maximum depth of 0.5 meters below the surrounding sea floor. The team also measured the cover and density of different seagrass communities in the injured area and in the surrounding area. The team determined that the dominant seagrass in the adjacent uninjured area was Thalassia, with an average percent cover of 26.10%, representing a healthy seagrass bed. In the injured area, the average cover ranged from 0-2.5%.

2

On December 21, 2007, another team, comprised of Shelli Braynard ("Braynard"), Lonny Anderson ("Anderson"), and Hatsue Bailey ("Bailey") reassessed the injured area first surveyed by Kirsch and Meehan. The team found that since the initial assessment, the injured area had expanded in a northeasterly direction by 309.24 square meters. Also, 166.27 cubic meters of additional sediment had been removed from the area. The average percent of cover in the surrounding area was approximately the same and there was no seagrass found within the injured area.

On July 19, 2007, the Government filed a complaint against Barlow and the M/V Non-Compete, seeking damages for the injury to the seagrass bed pursuant to the National Marine Sanctuaries Act ("NMSA"), 16 U.S.C. § 1443(a)(1). The Complaint alleged $94,145 in damages arising from the grounding. Compl., at ¶ 16. The Government now seeks damages of at least $507,915.94 for additional damage to the injured area that has occurred since the grounding.

## II.   STANDARD OF REVIEW

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. Twiss v. Kury, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). An issue of fact is "material" if it is a legal element of the claim under the applicable substantive law which might

affect the outcome of the case. <u>Allen v. Tyson Foods, Inc.</u>, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. <u>Id.</u>

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. <u>Id.</u> However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 252 (1986).

### III.  ANALYSIS

#### A.  Issues of Material Fact

There is an issue of material fact concerning whether the injured area for which the government seeks damages is actually the location where the M/V Non-Compete ran aground. The GPS coordinates reported by Felton on the disabled boat sheet report were N 24-33.6' and W 081-49.9'. Def.'s Statement of Material Facts Not in Dispute, at ¶ 24 (dkt # 45). The coordinates Felton reported to the FWCC were N 24-33.602' and W 081-49.947'. However, Felton does not recall the source of these coordinates. Dec. of Felton, at ¶ 11 (dkt # 39-3). One possible source of the coordinates provided by Felton on the disabled boat sheet report is from the call Barlow placed to A & B Marine. *See* Felton Dep., at 46 (dkt # 46-8). If Barlow provided these coordinates to A & B Marine, A & B Marine may have relayed the coordinates to Felton.

Another possible source of the coordinates was from the tug boat used by Felton in the

4

towing operation, which had a GPS receiver. Id., at 20-21. The GPS on Felton's tug had an error rate of 300 feet. Id., at 48. When ungrounding a vessel, Felton's practice was to approach the grounded vessel in a smaller boat in order to tie a bridle around the grounded vessel. Id., at 12, 30. Felton's smaller boat had no GPS system. Id. The tug would remain a few hundred feet away from the grounded vessel and would commence towing at high tide. Id., at 12-13. On certain occasions, Felton had ungrounded a vessel from as far away as one nautical mile. Dec. of Felton, at ¶ 7 (dkt # 39-3). Felton, however, stated that he did "not really" have any independent recollection of towing the M/V Non-Compete. Id., at 9.

If the GPS coordinates Felton provided to the FWCC came from the GPS on his tug, the coordinates could be anywhere within a circle with a radius of 300 feet, with Felton's tug being at the center of the circle. This assumes that the error rate of the GPS on the tug is a maximum of 300 feet and a minimum of zero. Thus, if Felton followed his standard practice of ungrounding the M/V Non-Compete from a distance of a few hundred feet, assuming, *arguendo*, that 300 feet would be a typical towing distance for the tug, then the coordinates Felton provided could have been as far away as 600 feet from the injured area, or as close as directly within the injured area.

When Dipre proceeded to the vicinity of the injured area the following day, he found a PVC stake located at GPS coordinates N 24-33.612' and W 081-50.164'. Def.'s Statement of Material Facts Not in Dispute, at ¶ 61 (dkt # 45). Dipre reported these coordinates in his citation and NOAA Offense Investigation Report. Id. The coordinates where Dipre located the PVC stake are approximately 400 yards, or 1200 feet, from the coordinates reported by Felton. Assuming Felton's tug was the source of the coordinates reported to FWCC, taking into account the 300 foot error rate of the GPS on Felton's tug, and assuming that a maximum error of 300 feet occurred in the direction of the injured area, Felton's tug must have been at least 900 feet from the M/V Non-Compete when the ungrounding took place. If the maximum error rate of 300 feet occurred in the

5

direction away from the grounding, then the tug must have initiated the ungrounding at least 1500 feet away from the M/V Non-Compete. On the other hand, if the coordinates reported by Felton originated with Barlow, and the coordinates reported by Barlow were the coordinates where the grounding occurred, then there is no possibility that the injury area for which the Government seeks compensation was the area where the M/V Non-Compete ran aground unless the error rate of Barlow's GPS was at least 1200 feet. However, no such evidence has been presented.

While a distance of between 900 and 1500 feet is less than the maximum distance from which Felton had initiated a tow in the past, and his recollection of ungrounding the M/V Non-Compete is limited, 900 to 1500 feet is a distance approximately three to five times greater than Felton's standard towing practice. If an aberration of this magnitude from Felton's standard practice actually occurred, there is some reason to believe that Felton would be more likely to have a specific recollection of the event. Yet Felton is unable to state with certainty how far away the tug was from the M/V Non-Compete when the ungrounding occurred.

Moreover, Barlow states that only one vessel participated in the ungrounding, that it came within a few feet of the M/V/ Non-Compete, and that the ungrounding took place immediately without waiting for high tide. Barlow Dep., at 50. If this were the case, then any GPS coordinates that originated from either Barlow or Felton would have been the same, with the exception of the 300 foot error rate of Felton's GPS. In this case, even if the 300 foot error occurred in the direction where the PVC stake was actually located, there would still be 900 feet between the site of the ungrounding and the location of the injured area where the Government asserts the ungrounding occurred.

Viewing these facts in the light most favorable to the non-moving party, the location where the M/V Non-Compete ran aground cannot be ascertained with certainty. Nor can the location of the injured area where the PVC stake was found be ruled out as the location of the grounding,

because a rationale jury could find that Felton's tug ungrounded the M/V Non-Compete from a distance of 900 feet or more. The uncertainty that results from the disparities in the relevant coordinates and the competing versions of events give rise to material issues of fact that must be resolved at trial. While other issues of material fact may exist, the issues described above are sufficient to prevent this Court from resolving the liability claims in Plaintiff's favor.

B. Statute of Limitations

Defendant asserts that the Government's claim is barred by the statute of limitations because the statute effectively creates a potentially unlimited statute of limitations. Section 1443(e) of the NMSA states:

> An action for response costs or damages under subsection (c) of this section shall be barred unless the complaint is filed within 3 years after the date on which the Secretary completes a damage assessment and restoration plan for the sanctuary resources to which the action relates.

16 U.S.C. 1443(e). It is "a familiar canon of statutory construction that the plain language of a statute must control its meaning in the absence of 'clear evidence' of a 'clearly expressed' Congressional intent to the contrary." Bread Political Action Comm. v. Federal Election Comm'n, 455 U.S. 577, 580 (1982) (citing United States v. Apfelbaum, 445 U.S. 115, 121 (1980) and Consumer Products Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980)). The language of NMSA's statute of limitations provision is clear and unambiguous. There is no clear evidence that Congress intended courts to create a de facto limitation on how long the Secretary of Commerce has to complete a damage assessment and restoration plan. Nor is there any clearly expressed Congressional intent to limit the time in which a damage assessment and restoration plan may be completed. While there may be internal agency procedures establishing an intended timeline concerning completion of a damage assessment and restoration plan, any such procedure has no bearing on triggering the statute of limitations. The NMSA's statute of limitations period runs three years after the damage assessment and restoration plan is actually completed, without

reference to when their completion was intended. Here, the M/V Non-Compete ran aground on November 16, 2003. The damage assessment was completed on September 24, 2007. *See* Def.'s Statement of Material Facts Not in Dispute, at ¶ 6 (dkt # 45). The restoration plan was completed on January 8, 2005. Id., at ¶ 7. The complaint was filed on July 16, 2007. Compl. (dkt # 1). The complaint was filed within three years of the completion of the damage assessment and restoration plan. Therefore, the Government's claim is not barred by the statute of limitations.

For the reasons stated above, the doctrine of laches does not apply. Nor is the Government's claim barred by the doctrine of spoliation as a result of the loss of the PVC marker used to identify the location of the M/V Non-Compete's grounding. "Sanctions for spoliation are appropriate 'only when the absence of that evidence is predicated on bad faith.'" Sharp v. City of Palatka, 06-cv-200-J-TEM, 2008 WL 89762, at *1 (M.D.Fla. 2008) (quoting Bashir v. Amtrak, 119 F.3d 929, 931 (11th Cir. 1997). "Mere negligence in losing or destroying the [evidence] is not enough for an adverse inference." Id. (internal quotation omitted). Defendant has presented no evidence of bad faith concerning the loss of the PVC marker. Therefore, the doctrine of spoliation does not apply here.

C.  Damages

Barlow asserts that Plaintiff may not seek damages in excess of the original amount alleged in the Complaint because the Government failed to mitigate the damages and because any additional damage to the injured area was caused by acts of God. The damages provision of the NMSA states:

> (6) "damages" includes --
>     (A) compensation for --
>         (i)(I) the cost of replacing, restoring, or acquiring the equivalent of a sanctuary resource, and
>             (II) the value of the lost use of a sanctuary resource pending its restoration or replacement or the acquisition of an equivalent sanctuary resource; or
>         (ii) the value of a sanctuary resource if the sanctuary resource cannot

> be restored or replaced or if the equivalent of such resource cannot be acquired;
> (B) the cost of damage assessments under section 1443(b)(2) of this title;
> (C) the reasonable cost of monitoring appropriate to the injured, restored, or replaced resources;
> (D) the cost of curation and conservation of archeological, historical, and cultural sanctuary resources;
> (E) the cost of enforcement actions undertaken by the Secretary in response to the destruction or loss of, or injury to, a sanctuary resource[.]

16 U.S.C. § 1432(6). A person is not liable for damages if the person establishes that "the destruction or loss, or injury to, the sanctuary resource was caused solely by an act of God . . . and the person acted with due care." 16 U.S.C. § 1443(3)(A).

When a federal statute enumerates defenses to liability, without specifying that other unenumerated defenses are available, the enumerated statutory defenses are generally deemed to be the exclusive defenses available under the statute. *See* Hall Street Assocs., L.L.C v. Mattel, Inc., 128 S. Ct. 1396, 1400 (2008) (finding that the enumerated statutory grounds for vacatur and modification under the Federal Arbitration Act were exclusive); U.S. v. 175 Inwood Assocs. LLP, 220 F. Supp.2d 213, 226 (E.D.N.Y. 2004) (stating that the Comprehensive Environmental Response, Compensation, and Liability Act's ("CERCLA") enumerated defenses against liability are the exclusive defenses available); Nicor Int'l Corp. v. El Paso Corp., 292 F Supp.2d 1357, 1373 (S.D.Fla. 2003) (stating that enumerated defenses in the Inter-American Convention on International Commercial Arbitration are the exclusive defenses available against foreign enforcement of an foreign arbitral award); In re Kmart Corp., 04 C 4978 (St. Eve, J.), 2004 WL 2222265, at * 2 (N.D.Ill. 2004) (stating that the defenses set forth in Section 547(c) of the Bankruptcy Code are the exclusive defenses to the trustee's power to avoid certain transfers). The NMSA's enumerated defenses do not make reference to the availability of other defenses. Moreover, the text and substance of the NMSA's defenses are similar to the defenses enumerated under CERCLA, which are also viewed as exclusive. Therefore, the defenses enumerated in the

NMSA are the exclusive defenses to liability available under the Act.

In this case, none of the NMSA's enumerated defenses apply to Defendants. Assuming the area injured by the grounding of the M/V Non-Compete is identifiable, the injury was not caused solely by an act of God because the initial blowhole was created by the impact of Barlow's vessel as it ran aground. Currents and weather-related conditions may have subsequently contributed to the damage. Nevertheless, currents are not acts of God because they are continuous events that are expected and largely predictable in nature. Weather-related conditions such as hurricanes may be classified as acts of God. However, while the damage to the injured area may have been augmented by hurricanes and weather, the damage was not caused solely by a weather related condition constituting an act of God. Furthermore, Barlow has not established that he was exercising due care at the time the M/V Non-Compete ran aground. Therefore, the NMSA's defenses are inapplicable to Barlow. Accordingly, Plaintiff may seek damages in an amount consonant with the NMSA's damages provision.

## IV.   CONCLUSION

Based on the foregoing, it is

ORDERED AND ADJUDGED that Defendants' Motion for Summary Judgment as to Liability and Damages (dkt # 44) is DENIED. It is further

ORDERED AND ADJUDGED that Defendants' Motion to Strike Plaintiff's Cross-Motion for Summary Judgment (dkt # 69) is GRANTED. Plaintiff's Motion for Summary Judgment (dkt # 60) was filed 20 days after the filing deadline without leave of the Court and is hereby STRICKEN.

DONE AND ORDERED in Chambers at Miami, Florida, this 9th day of September, 2008

K. MICHAEL MOORE
UNITED STATES DISTRICT JUDGE

cc: All counsel of record