UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No.: 07-10058-CIV-MOORE / SIMONTON

IN ADMIRALTY

UNITED STATES OF AMERICA,

    Plaintiff,

v.

STEPHEN ROBERT BARLOW,
*in personam*, and the
M/V NONCOMPETE,
including her motor, apparel, tackle,
appurtences, etc., *in rem*,

    Defendants.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

A bench trial was held in the above entitled matter between October 6, 2008 and October 10, 2008 in Miami, FL. A site visit was conducted to the Key West's Northwest Channel on October 2, 2008. The Court issues these Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## FINDINGS OF FACT

1.     Stephen Barlow owned the 52' Hatteras M/V NONCOMPETE that was routinely docked at A & B Marina in Key West, FL. M/V NONCOMPETE had a draft of 4.5 feet. M/V NONCOMPETE was a 1985 model year 52' Hatteras yacht.

2.     On November 16, 2003 Mr. Barlow took his family and friends on a cruise on board M/V NONCOMPETE. The vessel departed A & B Marina at approximately 12:15 p.m. and traveled for a short cruise in Key West's Northwest Channel.

3. At approximately 2:00 p.m., NONCOMPETE began its return trip back to A & B Marina traveling in a southeasterly direction in Key West's Northwest Channel, toward Key West.

4. At approximately 2:10 p.m., Mr. Stephen Barlow, while operating M/V NONCOMPETE back to A & B Marina, ran aground in sand near Marker 18. NOAA tidal data for November 16, 2003 established that high tide was at 4:01 p.m., with a predicted height of 1.3 feet above the charted depth. The charted depth on the relevant NOAA charts is mean lower low water (MLLW).

5. After running aground, Mr. Barlow did not attempt to back off with the engines and turned off the vessel's engines.

6. Mr. Stephen Barlow, Mr. John Mitchell, Mr. Mike Boysen and Mr. Kory Bowe proceeded to disembark NONCOMPETE, entered the water in their bare feet, and waded around the vessel while she was aground. They observed NONCOMPETE was aground on a sandbar and that there was no seagrass in the area.

7. Mr. Stephen Barlow called A & B Marina, reported the latitude and longitude of the grounding, and requested assistance.

8. A & B Marina contacted Florida Keys Harbor Service, a local towage and salvage company then owned by James Felton, and advised Felton of the coordinates where NONCOMPETE was aground and requested him to go to the site to render the necessary assistance to the vessel and its passengers.

9. Florida Keys Harbor Service responded with two vessels to the site where NONCOMPETE was aground. The two vessels had no problem locating and coming alongside NONCOMPETE while she was aground.

10. As part of his customary practice when a vessel grounding occurs, on the way to the location of the grounding, James Felton made a telephonic report to FFWCC Dispatch at 2:15 p.m. and advised them that the NONCOMPETE grounded at GPS Coordinates N 24-33.602' and W 081-49.947'. Mr. Felton also reported that the location of the grounding was .2 miles northwest of Marker 18.

11. As part of its usual and customary practice, the FFWCC then prepared and filed a report recording the information as provided by Mr. Felton. The FFWCC report contains the notation "S29G" meaning that the vessel is aground.

12. The latitude and longitude coordinates reported by Mr. Felton and recorded in the FFWCC report as to where the NONCOMPETE grounded, are more than 375 meters due east from any injured sea grass area for which the United States is seeking recovery of damages in this case.

13. As part of its usual and customary practice, Florida Keys Harbor Service, Inc., prepared a "Disabled Boat Information" report documenting the position of the grounding of NONCOMPETE. The "Disabled Boat Information" report, filled out at the time of the grounding, documents the position of the grounding as having occurred at GPS Coordinates N 24-33.6' and W 081-49.9'. The GPS Coordinates N 24-33.6' and W 081-49.9', are more than 400 meters due east from any injured sea grass area for which the United States is seeking recovery in this litigation. Felton testified that the position recorded in his "Disabled Boat Information" may have been the location of his vessel at the time he recorded the position as opposed to the actual position of the NONCOMPETE. The draft of Mr. Felton's larger tow vessel, the C.O. Jones, was approximately 3.5 feet.

14. The distance between the GPS Coordinates N 24-33.6' and W 081-49.9' (Key West Harbor Service business record) and the GPS Coordinates N 24-33.602' and W 081-49.947' (coordinates telephoned in to FFWCC by Mr. Felton) is approximately 200 feet, the length of the towline used by Felton to tow NONCOMPETE as testified to by Felton.

15. Sometime after the Florida Keys Harbor Services' vessels arrived at the NONCOMPETE grounding site, a generic PVC marker was placed at the stern of the NONCOMPETE into the sandbar by an unknown employee of Key West Harbor Services, Inc. Other than being painted blue on the top of the PVC marker, there were no other identification markings on the PVC marker.

16. At high tide, at approximately 4:01 p.m., Florida Keys Harbor Service hooked up a towing line and towing bridle to M/V NONCOMPETE. The tow line was approximately 200 feet in length.

17. At 4:16 p.m., someone from Florida Keys Harbor Service took a picture of M/V NONCOMPETE floating with a tow bridle and tow line clearly attached. After reviewing Plaintiff's Exhibit "1", which is of a 52' Hatteras yacht floating at a pier, it is clear from looking at NONCOMPETE's boot-top and uniform waterline in the photograph taken on November 16, 2003 at 4:16 p.m., that NONCOMPETE was afloat when the picture was taken. Furthermore, after review of the Plaintiff's own bathymetry readings from the July 7, 2004 injury assessment and noting that the draft of M/V NONCOMPETE is 4.5 ft, it is clear that NONCOMPETE, as shown in the Felton picture taken at 4:16 p.m., is not inside any area of seagrass for which the United States seeks recovery.

18. After being towed to the A & B Marina, M/V NONCOMPETE was inspected by divers for underwater damage. The divers reported that there was no damage to M/V

NONCOMPETE's propellers and that there was no damage to the bottom. NONCOMPETE did not require any maintenance or repair after the grounding.

19. On November 17, 2003, Officer David Dipre, of the Florida Fish and Wildlife Conservation Commission (FFWCC), was assigned the responsibility of investigating the grounding of M/V NONCOMPETE as reported by Felton the previous day.

20. Pursuant to his standard enforcement procedures, prior to going to the reported grounding site, Officer Dipre conducted an outbound GPS verification at Red Marker 50, a fixed marker with a chartered position, in Hawk Channel at 9:45 a.m. to determine any position error that may have been present in his GPS equipment. The GPS verification was utilized as a check on the accuracy of the GPS transceivers located aboard his enforcement vessel. Officer Dipre recorded the position of Red Marker 50 on both the Garmin 2006 GPS and Garmin 76 GPS transceivers onboard his vessel. The recorded offset from Red Marker 50 was approximately 1,300 ft for the GARMIN 2006 and approximately 1,300 ft for the GARMIN 76. Both errors were in a westerly direction, meaning that the indicated positions were to the west of the actual position.

21. The GPS Verification Form used by Officer Dipre is NOAA Standard Form (M150) 02/2003. The GPS Verification Form which was used by Officer Dipre is a part of NOAA's standard enforcement package.

22. After departing Red Marker 50, Officer Dipre then proceeded to the reported grounding position of M/V NONCOMPETE approximately 25 nautical miles away.

23. After arriving in the vicinity of the Northwest Channel, Officer David Dipre searched for and located a generic PVC marker in the vicinity of the reported grounding. Using

one of his GPS transceivers, Officer Dipre recorded the GPS coordinates of N 24-33.612' and W 081-50.164' for the PVC marker.

24. At 2:45 p.m. Officer David Dipre, conducted an inbound GPS verification at Red Marker 2 in South Pine Channel, another fixed marker with a chartered position. The offsets from Red Marker 2 were approximately 300 ft for the GARMIN 2006 and approximately 300 ft for the GARMIN 76. Both errors were in a northwesterly direction.

25. The GPS coordinates of N 24-33.612' and W 081-50.164' for the PVC marker as documented and reported in Officer Dipre's citation and NOAA Offense Investigation Report are not within any injured sea grass area for which the United States is seeking damages in this case. After correcting the recorded coordinates of N 24-33.612' and W 081-50.164' for the existing, known GPS offsets as also documented by Officer Dipre, none of Officer Dipre's corrected GPS positions are inside any area of seagrass for which the United States seeks recovery.

26. The PVC Marker found by Officer Dipre on November 17, 2003 did not have a serial number or any other distinguishing or identifying marker to distinguish it from other PVC Markers issued by NOAA to mark other grounding sites. FWCC now uses PVC markers that have serial numbers.

27. The PVC Marker identified on November 17, 2003 by Officer Dipre was left unattended for 7 months and 20 days until a NOAA team arrived in the area to conduct a damage assessment.

28. On June 3, 2004, a new policy was instituted by NOAA's MINI 312 seagrass team that involved the retention of a financial forensics expert to review backlogged cases to determine the financial viability of potential responsible parties.

29. On July 7, 2004, Mr. Sean Meehan and Mr. Kevin Kirsch were assigned the task of conducting an injury assessment in relation to Officer Dipre's investigation package from November 17, 2003. It was the duty of the injury assessment team to confirm the exact location of the grounding, as well as to conduct a scientific analysis of the nature and extent of any resultant seagrass damage.

30. Upon arriving in the general vicinity of the reported grounding and observing a PVC stake, the 2004 assessment team assumed it was the correct stake and that it was located at the location of the reported grounding.

31. Despite having extremely accurate Trimble GPS equipment, the injury assessment team made no effort to determine or record the GPS coordinates of the PVC Marker on July 7, 2004. The injury assessment team did not know of, apply or calculate the error from Officer Dipre's GPS verification form. The assessment team did not compare the position of the PVC Marker they observed to the coordinates of the PVC marker as recorded by Officer Dipre.

32. The injury assessment team did not inspect the PVC marker for any evidence that it may have been moved. The injury assessment team did not know that the Florida Fish and Wildlife Conservation Commission gave out generic PVC markers to salvors throughout the Florida Keys.

33. Video taken by the assessment team on July 7, 2004 shows a PVC marker inside the injured area. The video from July 7, 2004 also shows a PVC marker with irregular algal growth. Uncontroverted expert testimony introduced at trial by Defendants established that the algal growth shown on the PVC stake in the video is a species of algae that does not grow in that area of the bank. Therefore, there is strong inference that the PVC marker was, at some point between Officer Dipre leaving the PVC marker on November 17, 2003 and the video

taken 7 months and 20 days later on July 7, 2004, moved from a location where that specific algae grows.

34. There were several other seagrass injuries in the immediate vicinity of the PVC marker identified by the assessment team on July 7, 2004. The injury assessment team did not record any of the locations of the other seagrass injuries they observed in the immediate vicinity of the PVC Marker found on July 7, 2004.

35. The injury assessment team conducted a *Braun-Blanquet* visual assessment in order to assess the seagrass damage inside the injured area as compared to the uninjured seagrass in an area 1-3 meters adjacent to the perimeter of the injured area. The injury assessment team did not conduct an assessment of the surrounding seagrass beyond the immediate perimeter of what they assumed to be the area damaged by NONCOMPETE. The injury assessment team did not record the latitude and longitude of the *Braun-Blanquet* visual assessment drop points.

36. After the injury assessment on July 7, 2004, the assessment team removed and discarded the PVC Marker.

37. On September 24, 2004, the 2004 injury assessment team issued their Vessel Injury Assessment Report stating that the geographic position of the sea grass damage and "blowhole" allegedly created by Stephen Barlow at the time of the grounding was at GPS Coordinates N 024-33.6607' and W 081-50.1726'. This report also states that Officer Dipre installed the PVC marker at the site. These coordinates are necessarily the coordinates of the position of the blowhole and seagrass damage for which the United States filed suit in this case. These coordinates are necessarily the coordinates for which the United States sent to Defendant Mr. Stephen Barlow as part of their demand letter for compensation. The hand-written field

notes related to the documentation of the damage assessment, including prop scars found in the area during the July 7, 2004 injury assessment were subsequently lost by Plaintiffs.

38. Officer Dipre's recorded, but uncorrected, position of N 24-33.612' and W 081-50.164' is more than 20 meters from any portion of the injury perimeter allegedly surveyed by NOAA on July 7, 2004. The position recorded by Officer Dipre, when corrected with any of four verifications for the GPS transceivers, is hundreds of feet from any portion of the injury perimeter surveyed on July 7, 2004.

39. When NOAA was requested to produce the electronic files, including the Trimble data, for the July 7, 2004 injury assessment, it was discovered that there was no meta-data for any of the GIS shapefiles downloaded from the field Trimble unit utilized on July 7, 2004. Accordingly, it is impossible to determine the potential for satellite errors and coordinate errors.

40. A second injury assessment was conducted by NOAA on December 21, 2007 and a second injury assessment report dated January 11, 2008 was issued. This report states that the sea grass damage "blowhole" allegedly created by Stephen Barlow was then recorded as being located at GPS Coordinates N 024-33.602' and W 081-50.169', a position that, if accurate, would be 300 yards from the position recorded by the NOAA injury assessment team in July 2004. This report also states that James Felton documented the alleged grounding as having occurred at GPS coordinates N 24-33.612' and W 081-50.164' and, further, that at the time of the grounding, Mr. Felton installed a PVC marker within the location of the injury. Despite knowing of the discrepancy in the September 24, 2004 injury assessment report on December 3, 2007, the January 11, 2008 report of the December 21, 2007 injury assessment, provides no explanation for the difference between the recorded coordinates of the July 2004 injury

assessment and the December 2007 injury assessment. At trial, the only explanation offered by the United States was that the 2004 position must have been a "typographical error".

41. The December 2007 GPS Coordinates of N 024-33.602' and W 081-50.169' are nearly 100 meters from the position of the sea grass "blowhole" detailed in the injury assessment report dated September 24, 2004. Furthermore, Officer Dipre's recorded, but uncorrected, stake position of N 24-33.612' and W 081-50.164' is not inside any portion of the injury perimeter surveyed on December 21, 2007. Similarly, Officer Dipre's recorded position, when corrected for the GPS error, is hundreds of feet from any portion of the injury perimeter surveyed on December 21, 2007.

42. Uncontroverted expert testimony introduced into evidence at trial by Defendants established that there is benthic algal vegetation, similar to that shown on the PVC stake in the July 2004 video, on the sea floor from the vicinity of GPS Coordinates N 24-33.6' and W 081-49.9' all the way up to the seagrass bank in question, but not in the area of the damage claimed by the United States.

43. The charted depth in the area for which damages are sought by the United States is 1 foot (MLLW). Based on the NOAA's own bathymetry in the September 24, 2004 injury assessment of the surrounding area, there was insufficient water, even at high tide, for NONCOMPETE to have reached the area where the United States claims the grounding occurred and where the seagrass damage for which damages are sought is located. Therefore, it was physically impossible for M/V NONCOMPETE to cause the seagrass damage for which damages are sought by the United States. Furthermore, the bottom configuration of a 1985 52' Hatteras, which has a sharp keel, would have left a different benthic imprint than the one found by the July 7, 2004 assessment team.

44. It was established that the charted water depths at the corrected position recorded by Officer Dipre, for the inbound GPS verification at Red Marker 2 in South Pine Channel, are such that NONCOMPETE could have gone aground in a position several hundred feet from the seagrass damage for which damages are sought is located.

45. Kevin Kirsch and Sean Meehan conducted a *Braun-Blanquet* visual assessment in order to assess the damage inside the injured area as compared to an area 1-3 meters adjacent to the perimeter of the injured area. The injury assessment conducted on July 7, 2004 did not conduct an assessment of the surrounding seagrass.

46. The Government's own expert witness testified that pre-existing damage areas expanded from south to north adjacent to the alleged blowhole.

## CONCLUSIONS OF LAW

1. The Court has admiralty jurisdiction over this case pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure and Supplemental Rules governing admiralty and maritime claims.

2. The Court also has jurisdiction in this claim pursuant to Section 312 (c) of the National Marine Sanctuaries Act, 16 U.S.C. § 1443 (c), and pursuant to 28 U.S.C. §§ 1331 (Federal question) and 1345 (United States as Plaintiff).

3. Under 16 U.S.C. § 1443(a)(1)(A), the United States must prove, by a preponderance of the evidence, that the damage to sanctuary resources the government seeks recovery for was proximately caused and the result of the grounding of M/V NONCOMPETE on November 16, 2003. 16 U.S.C. § 1443(a)(1)(A); *United States v. Great Lakes Dredge & Dock Co.*, 259 F.3d 1300, 1306 (11th Cir. 2001).

4.  The Court finds that the United States has failed to carry its burden of proof. Despite the plethora of conflicting GPS positions recorded by James Felton, Officer Dipre and the NOAA assessment teams in July 2004 and December 2007, the Court cannot find that NONCOMPETE actually went aground at any of those coordinates. To the contrary, the greater weight of the evidence, including the corrected GPS position recorded by Officer Dipre, the charted water depths, the bathymetry of the surrounding bank, NOAA's bathymetry of the alleged grounding area, the consistent algae bottom community, the fact that a 52' Hatteras such as M/V NONCOMPETE drafts 4.5 feet, and the particular bottom configuration of a 52' Hatteras is that M/V NONCOMPETE went aground approximately 300 feet to the southwest of the area for which seagrass damages are sought by the United States.

5.  The Court finds the injured seagrass and damages for which the United States seeks recovery in this action were not caused by and were not the proximate result of the grounding of M/V NONCOMPETE.

6.  The greater weight of the evidence is that M/V NONCOMPETE went aground on a sandy shoal populated by benthic algae in approximate position N 24 – 33.571' W 081 – 50.123'.

7.  Judgment is entered in favor of Defendants and against Plaintiff.

## CONCLUSIONS OF LAW IN THE EVENT THAT LIABILITY IS FOUND

8.  The quantum of damages recovered must be reasonable and based on sound science. *United States v. Great Lakes Dredge & Dock Co.*, 259 F.3d 1300, 1306 (11th Cir. 2001).

9.  Plaintiff must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of Defendants' wrongful conduct. The *Braun-Blanquet* visual assessment conducted, 1-3 meters adjacent to the perimeter

of the injured area, on July 7, 2004 did not scientifically assess the adjacent area so as to form the basis of Plaintiff's claim for expanded damages.

10. The type and manner of assessment conducted by Plaintiff's employees on July 7, 2004, leaves their claim for expanded damages as entirely speculative. The amount of damages must be capable of proof to a reasonable certainty and cannot be left to speculation or conjecture. *Travelers Indemnity Co. v. Peacock Construction Co.*, 423 F. 2d 1153, 1157 (5th Cir.1970). The United States failed to carry its burden of providing that the expanded damages claimed were the result of the expansion of and damage caused by NONCOMPETE. Based on the testimony of the Government's own witnesses the Court finds it more likely that the alleged "expansion" of the damaged area was the result of the expansion of pre-existing damage areas, wholly unrelated to the grounding of NONCOMPETE, adjacent to the areas assessed by NOAA in July 2004.

11. In Admiralty, a failure to mitigate damage is seen as the intervening cause of any subsequent loss or damage. *See Sinram v. Penn. Railroad Co.*,1932 AMC 1537 (2nd Cir. 1932)(barge owner who knew of damage and did nothing to mitigate or determine damage was found to be intervening cause of sinking and loss of cargo); *C. Itoh & Co. v. M/V Hans Leonhardt*, 719 F. Supp. 479 (E.D. La. 1989)(doctrine of intervening cause is applicable in admiralty law); *See also Exxon Co. v. Sofec*, 517 U.S. 830 (U.S. 1996)(in admiralty law a superseding cause of damage will cut off responsibility for that certain damage).

12. Attorney's fees are not recoverable in admiralty cases unless the non-prevailing party acted in bad faith or there is a statute that allows for the specific recovery of attorney's fees. *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 730 (5th Cir. 1980). does not allow for the recovery of attorney's fees, only enforcement costs. Furthermore, Plaintiff's failed

to disclose or provide any damage calculations related to enforcement costs expended and are therefore barred from the untimely assertion of these damages. Fed. R. Civ. P. 26(A)(1)(A)(iii).

## CONCLUSION

The Court finds in favor of the Defendants Stephen R. Barlow and M/V NONCOMPETE. The Defendants are not liable for the seagrass injury for which damages are sought by the Plaintiff.

**SO ORDERED** in Chambers this _____ day of October, 2008.

_____
K. M. MOORE
UNITED STATES DISTRICT JUDGE

Copies furnished to: all counsel of record