UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE No.: 07-10058-CIV-MOORE/SIMONTON
IN ADMIRALTY

UNITED STATES OF AMERICA,

    Plaintiff,

v.

STEPHEN ROBERT BARLOW, et al.,

    Defendants.
_____/

UNITED STATES' MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO AMEND
FINDINGS OF FACT AND CONCLUSIONS OF LAW

    The United States, by its attorneys, respectfully submits this memorandum of law in support of its motion to amend the findings of fact and conclusions of law.

## INTRODUCTION

    After careful analysis, the Court based its decision in favor of the Defendants primarily on the physical evidence. The most significant piece of physical evidence to the Court seemed to be the "tire tracks" of the grounding vessel.[1] What troubled the Court was the fact that the width of the propeller scars was only about 12 inches. The Court correctly concluded that the 30

---

  1. Supporting the government's case, NOAA's measurement of the injury in July 2004, some eight months after the grounding, showed that the propeller scars leading into the area of deeper excavation were 67 inches apart, as measured using the electronic data gathered by the Trimble unit in the 2004 injury assessment. Conclusions of Law, at ¶9. The distance of 67 inches closely matched the distance of 66 inches separating the propeller shafts of the NONCOMPETE. Id.

inch diameter propellers of the NONCOMPETE would have had to enter less than 2 inches into the ocean bottom to create an arc with a width of 12 inches. Court's Conclusions of Law (dated December 8, 2008), at ¶9 ("COL"). Thus, over 13 inches of the 15 inch radius propeller should have been above the bottom. Id.

A possible explanation offered by the Court was that the vessel was floating in some depth of water such that the bottom would be 1.25 inches within the vessel's draft. COL, at ¶13. The draft is the lowest point below a water line of the vessel while afloat. Barlow Testimony, at 349. Given that the draft of the NONCOMPETE at the propeller tip is 5 feet (or 60 inches) (COL, at ¶13), the bottom would have to be 58.75 inches deep for the propeller to enter at a depth of 1.25 inches. The Court concluded that based on the observed depths around the injury and the recorded tides on tide charts for Key West Harbor, the bottom could not be more than 54 inches under the most favorable interpretation. COL, at ¶13.

The Court concluded that if the NONCOMPETE ran aground at the injury site, the propeller scars should have been wider than 12 inches because the scars would have been deeper. COL, at ¶12. This was especially so if the NONCOMPETE were on a plane, lowering the draft even more than 60 inches. COL, at ¶11.

The Court conceptualized the grounding as a situation where the propellers, and no other part of the vessel, made initial

contact with the bottom:

> Given that the propellers are the portion of the vessel farthest below the surface of the water, the weight of the vessel upon impact would be resting entirely on the propellers, at least until the drag created by the propellers impacting the sea floor forced the hull downward until making contact with the sea bottom. . .

COL, at ¶¶ 11-12. The Court also expressed concern that a floating vessel making initial propeller contact with the bottom would not cause uniform prop scars because

> to create uniform propscars under such circumstances, the sea bottom would have to be completely flat across the 5 to 8 meter length of the propscars. Otherwise, the width of the propscars would vary considerably. . . . the 2004 bathymetry report demonstrates that the depth across the length of the propscars varies by .3 meters (1 1.8 inches), yet the width of each propscars is virtually uniform from one end to the other.

COL, at ¶13.

As discussed below, the United States presented testimony that in some instances, the hull of a vessel – not the propellers – will make initial contact with an elevated bank and the vessel will then ride up on the bank. As explained below, if this type of grounding occurred at a depth of two to three feet, then the physical evidence is actually consistent with the NONCOMPETE running aground at the injury site.

ARGUMENT

I.  THE EVIDENCE ON TIDES, PROPELLER WIDTH AND
    <u>PHOTOGRAPHS OF RANDOM VESSELS WAS UNFAIR SURPRISE.</u>

Defendant's Exhibit 51 may have influenced the Court's analysis. Defendant's Exhibit 51 was not listed on Defendants'

pretrial exhibit list, it was not included in the initial book of Defendants' exhibits, and it was not mentioned at all in Dr. Baca's expert report. Exhibit 51 was included in an amended exhibit book provided to the United States for the first time on the first day of trial as a demonstrative exhibit without any exhibit number. The first time the Government received a copy of Exhibit 51 as a marked exhibit was after trial. It is difficult to respond to arguments advanced for the first time in the middle of trial. Therefore, the United States respectfully requests that the Court reconsider its ruling based on the reasons set forth below.

As the Court is aware, the original Defendants' theory of the defense was based on the Felton location. In the Defendant's statement of their case in the pretrial statement, they noted that the Felton disabled boat information sheet was a business record and the only document that contemporaneously recorded the location of the grounding. See Statement of Defendants, Joint Pretrial Statement, at 10. Dr. Baca's original expert report focused on specific locations, and never gave any indication that he had measured propellers or consulted tide charts in his expert report to support an argument about depth and the draft of a vessel.[2]

---

2. Dr. Baca's expert report, filed on June 20, 2008, is in evidence as Plaintiff's Exhibit 48. There was no mention made of the width of propeller scars or the use of tide data to calculate

4

Rule 26(a)(2) of the Federal Rules of Civil Procedure

---

the depth of the ocean on the date of the grounding. On July 21, 2008, the discovery cut-off date, Dr. Baca submitted a supplement, without court approval, in which he stated on page 7 that

> According to NOAA (2004) Figure 3, the Non-Compete first struck the sandbank with her port wheel at a depth of approximately 2 feet (dark green color, -0.5 meters to -0.6 meters) and continued up onto the bank top until she came to rest at a point where the propeller scars enter the blowhole in a water depth of 1.64 feet (blue color, -0.4 meters to -0.5 meters). Captain Jimmy Felton declares that the Non-Compete most likely grounded between 12:00 p.m. and 1:00 p.m on November 16, 2003 (Felton 2008). Using Captain Felton's declaration as a guide, the Non-Compete most likely grounded between 12:00 p.m. and 1:00 p.m. on November 16, 2003. At noon on that date the tide was .08 feet above MLLW; at 1:00 p.m., it was 1.0 feet above MLLW. [All tidal data are taken from NOAA Station ID 4277, Lat 24 33.20 N, 81 48.50 W- Mean range 1.31 feet. Mean tide 0.90 feet]. . . . Using the bathymetric data provided in NOAA Figure 3, this means the Non-Compete would have first struck the bank top in approximately 18 inches of water and would have come to a suffed [SIC] and abrupt stop in less than a boat length in approximately 14 inches of water. Based on this information it is impossible to conclude that a vessel of the size and configuration of the Non-Compte could have caused the injuries to resources under the jurisdiction of the FKNMS as charged by the Government.

On July 29, 2008, Dr. Baca submitted a declaration in which he stated: "Information on the specifics of this Hatteras vessel, including visual inspection of its bottom, propellers, struts, rudders, etc. after the grounding, combined with nearby NOAA tidal data and physical characteristics of the alleged grounding site, further cast doubt on the events of the grounding as reported by NOAA. Declaration of Dr. Bart Baca, at ¶8. On August 23, 2008, about a month after the close of discovery, MacIntosh Marine, Inc. submitted its second supplemental report. Despite the fact that throughout the litigation the defendants contended that the grounding happened at the Felton Location, the defendants located an alternate site based on an "offset error from Light #2". The Court denied the motion to supplement.

5

requires a complete and detailed expert report that sets forth the substance of the expert's direct testimony. Ciomber v. Cooperative Plus, Inc., 527 F.3d 635, 642 (7th Cir. 2008); Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002). The report must be complete enough so that opposing counsel is not forced to depose an expert in order to avoid being surprised at trial. Ortiz-Lopez v. Sociedad Espanola de Auxilio Mutuo Y Beneficiencia de Puerto Rico, 248 F.3d 29, 35 (1st Cir. 2001); Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 742 (7th Cir. 1998).

In particular, the fact that Dr. Baca found a 52 foot Hatteras in dry dock and measured it, including the propellers, should have been disclosed. Reed v. Binder, 165 F.R.D. 424, 428 n. 6 (D.N.J. 1996) (an expert report should indicate "'what' the expert saw, heard, considered, read, thought about or relied upon in reaching the conclusions and opinions to be expressed").

Rule 37 provides for "automatic" preclusion for failure to comply with Rule 26(a)(2)(B)'s expert report requirement, absent a finding of harmless error or substantial justification. Fed.R.Civ.P. 37(c)(1). A deliberate act of surprise by counsel is never justified. OFS Fitel, LLC v. Epstein, Becker and Green, P.C., 2008 WL 5025041, 17 (11th Cir. 2008).

The Court overruled the United States' objection to the extensive trial testimony supplied by Dr. Baca that was not in

the expert report. Tr. at 428-29. Because Defendant did not disclose key aspects of Dr. Baca's expert testimony before trial, the United States respectfully requests that the Court entertain rebuttal to that testimony and respectfully submits that the Court should reconsider its finding that the NONCOMPETE could not have run aground at the injury site due to the signature of the propeller scars. The Court should reconsider based on the evidence in the record.

II. THE TESTIMONY AND EXHIBITS SHOW THAT A VESSEL CAN RUN AGROUND ON A SLOPE LEAVING SHALLOW PROPELLER SCARS.

To Court's concern about the physical evidence can be broken down into three components: (1) how some other part of the vessel could first come into contact with the bank, if the propellers are the deepest part of the vessel while floating; (2) why the keel and propellers did not sink deeper into the bottom; and (3) how propeller scars can remain at a constant 1-2 inch depth for a distance of 5 to 8 meters (16 to 25 feet or roughly half a boat length). These are addressed below, based only on evidence in the record.

    A. On a Sea Bottom that Rises on a Slope, the Point of First Contact Can Be the Keel at a point more than 25 feet away from the Propellers.

The Court is correct that in a grounding incident the distance from the water line above to the propellers below is relevant if the propellers make the first contact with the bottom. In fact, Dr. Kenworthy testified that the hull - rather

than the propellers - may make first contact with the bottom:

> First of all, when a vessel comes aground on a shallow bank, in particular, a seagrass bed, <u>the first thing that's going to happen is the hull is going to collide with the bank</u>. In the process of that collision, the force of the hull is going to displace sediment, and it's going to actually physically break through that rhizome mat. <u>The second thing that happens is the propellers</u> that are associated with the power feature of the vessel -- and we call it a prop scar.

<u>Kenworthy Testimony</u>, at 27 (emphasis added).

The evidence shows that while floating, the hull and the keel of the NONCOMPETE slope upward towards the front of the vessel, and at the front end would also be roughly on the order of 2 to 3 feet higher than the propellers. <u>Meadows Testimony</u>, at 293 (the distance between the bottom of the propeller and the hull at the rear would roughly be "somewhere between 18 and 24 inches."); <u>Cf</u>. <u>Defendants' Ex</u>. 51 at page 2 and 3 (showing the hull sloping up from a 55 inch depth line towards the water line); <u>see also</u> <u>Kirsch Testimony</u>, at 151.

The Court also noted that the injury site sloped upwards in the direction of the injury. COL, at ¶13. The Court stated that based on the 2004 measurements of the prop scars that this area had a rise of about .3 meters (11.7 inches) over a distance of about 5 to 8 meters (16.25 feet to 26 feet). <u>See</u> COL, at ¶13. Since the vessel is 16 meters or 52 feet long (<u>Kirsch Testimony</u> at 151), this same slope would equate to a rise of one foot over one third to one half the length of the 52 foot boat, meaning

that the sea floor could have been 2 to 3 feet higher at the front end of the keel, as compared to the rear, over the entire length of the vessel.

The Court should reconsider whether the keel (instead of the propellers) would come into contact first with the ocean bottom that is sloped. A slope would put the keel towards the front in first contact while the rear of the keel and the propellers are still in deeper water and are not yet in contact with the sea floor.

> B. The Propellers and Keel May Have Left a Different Signature Along Its Path, But the Powering Off Erased that Area.

The Court noted that Mr. Barlow testified that the vessel traveled one or two boat lengths. Findings of Fact, at ¶2. There is no record of what the entire length of the prop scar looked like because the act of powering off created a deep excavation that removed material about 10 meters in length (32.5 feet) at a depth of up to one meter (39 inches or 3 feet). Kenworthy Testimony, at 27-28; Meehan Testimony, at 216. Pl. Ex, 9, Figure 3. Thus, the Court's concern that there were no deep, 30-inch scars is addressed because the powering off could have erased this signature. Therefore the Court should reconsider whether the absence of evidence of deeper scars is dispositive.

C.  The 5 to 8 Meter Shallow Scars Result Because the Rear of the Vessel is Lifted as the Front Portion of the Vessel Drives up and into the Slope.

Officer Dipre made clear that in the seagrass groundings he had observed the vessels lifted onto the bank and slid:

> the seagrass will certainly help slow the vessel down. The majority of the times, the vessel will come in there, ride up on top of the seagrass, at least the majority of time ride up on top of the seagrass, and then come to a stop because there is no more water suspending it and now it's sitting on the surface of the seagrass, which is certainly not intended to be where the vessel's supposed to be.

Dipre Testimony, at 314.

The Court itself noted that if the propellers come into initial contact with the bottom then the weight of the vessel would be on the propellers. COL, at ¶12. Similarly, if the point of first contact were, for example, the midpoint of the keel 25 feet in front of the tip of the propeller, then the weight would first compress on that point. As the front part of the vessel slides onto the bank, the rear part of the vessel that is not in contact is still floating. That part is still buoyant. Kirsch Testimony, at 135.

However, there was also testimony that the thick mat of rhizomes will soften any impact from the initial contact. See Kenworthy Testimony, at 170 (standing on seagrass, it is slightly compressive). Dr. Kenworthy also noted that to some extent the keel can plow through the rhizome mat. See Kenworthy Testimony, at 111 ("piling" should be "plowing").

10

As documented in Plaintiff's Exhibit 9, Figure 3, the remaining prop scar signature as of 2004 was 5 to 8 meters, or only about one third to one half of a boat length. The Court should reconsider whether the NONCOMPETE could make shallow propeller scars for this short distance to the extent the keel towards the front grounds first, and the vessel rides up the slope, thereby elevating the propellers at the rear, relative to the sea floor.

> 1. A grounded vessel has no draft, so the propellers are not automatically "deeper" than the keel.

Defendant's Exhibit 51 illustrates the configuration of a 52 foot Hatteras while floating. It illustrates the "draft" which is the lowest point of the vessel while floating. When floating, as in Exhibit 51, the lowest point is the tip of the propellers (Point A) and the keel slopes up to bow at the water line (Point B.) While floating, as in Exhibit 51, Point A is five feet below Point B. As shown on Exhibit A, when a vessel is "aground" on hard ground and lying on the keel, the vessel will conform to the keel. See also Page 7 of Defendants Exhibit 51, attached hereto as Exhibit B. Exhibit A is the same figure offered by the Defendants in Defendants' Exhibit 51, but a line has been drawn to show how the vessel, flat on hard ground on its keel, would assume a different posture than while floating.[3]

---

3. Exhibit A is offered simply as a demonstrative for purposes of this argument, not substantive evidence. If the arguments

    2.    <u>As the keel creates a keel scar at front, the rear of the keel may not be touching seagrass at all.</u>

Just as in Exhibit A, as the front of the keel digs in, the keel (or hull) will still conform to the terrain as it plows forward. If the terrain grows more shallow in steps, the vessel will rise in steps as it enters and slides. Meanwhile, the rear of the keel - which could be 5 to 8 meters behind the point where the keel is cutting in - will continue to elevate, meaning that it may not be touching the seagrass at all.

The point is simply that to the degree that the keel is elevated as the terrain elevates, the trailing keel that has not yet reached the point of initial impact will elevate without leaving a keel mark.

    3.    <u>The propellers are slightly lower than the keel line, so they may leave a slight scar even where the keel does not.</u>

The propellers, meanwhile are also moving forward on a constant slope parallel to the keel to which they are attached. When the keel is on land or on seagrass, these propellers are running just a few inches deeper than the rear of the keel itself. Page 7 of Defendants Exhibit 51, attached hereto as Exhibit B, depicts a 52 foot Hatteras with the keel placed on blocks. A measurement line provided by Defendants shows that the

---

based on the evidence in the record are not clear to the Court, oral argument might assist the Court in resolving the motion to amend.

tip of the propellers on land is actually only several inches below the keel. Dr. Baca himself stated that "the keel is only a few inches shallower than the props." Dr. Baca Testimony, at 430.

Thus, the propellers will be jutting down "a few inches" lower than the rear of the keel, which in turn is moving forward just above the seagrass without leaving a scar. Even if the front of keel of the vessel plowed into the bank, as the vessel continued according to the slope of the keel/hull, the propellers would also stay constant as the vessel slid forward, which explains the Court's other major concern about the uniformity of the prop scars. COL, at ¶13. As the vessel slid across the flat bank at the highest elevation, the trailing keel was running parallel to the seagrass while the trailing propellers were always just a few inches deeper than the rear of the keel.

Again, this would have to occur for about 5 to 8 meters, which amounts to about half a boat-length.

D. Summary.

The Court's concern that "Plaintiff has provided no other explanation, and this Court is unable to ascertain, how under these circumstances a 30 inch propeller could have created propscars 12.5 inches wide.," COL at ¶14, is explained by the angle of the vessel while running aground, not by the long distance between the water line above and the propeller below

13

when the vessel is floating.

III. <u>THE OTHER PHYSICAL EVIDENCE IS CONSISTENT AS WELL</u>.

With regard to the photograph of the NONCOMPETE taken by Captain Felton, the point the Government attempted to make was not that an azimuth needs to be calculated, but rather that Cottrell Key, the grounded NONCOMPETE and the photographer were on the same line. If a comparison is made of the photograph taken by Shelli Braynard on August 13, 2008 at 14:51 (from the location she believes Felton was at when he photographed the NONCOMPETE) to the actual Felton photo, it is clear that the grounding site must be on a particular line. Changing position to the north moves Cottrell Key to a different line. For example, the photograph taken even from the Dipre position (at 14:41), a short distance away, does not allow the three points to line up. The further out the line into deeper water one travels, the more likely the after range finder (tower) enters the photograph. This is depicted, for example, by the photograph taken by Hatsue Bailey near Marker 18 on July 3, 2008. Some photographs are attached illustrating the comparison, including the Exhibit marked by Shelli Braynard to identify the location of the various landmarks. The location of Cottrell Key on the photographs taken at 14:51 has been noted. Also, the Government will provide the original of Plaintiff's Exhibit 2, which shows the location of the various landmarks.

CONCLUSION

The Court concluded that the stake was placed at the site of the grounding, that Officer Dipre left the stake there for the NOAA assessment team and that the NOAA assessment team found the stake in July 2004. Having concluded that the stake was not moved, the Court has concluded that the grounding occurred at the injury site, provided that the Court has resolved the apparent inconsistency in the physical evidence. All the physical evidence is consistent with the conclusion that the NONCOMPETE ran aground at the injury site. The United States respectfully requests the Court to reconsider its findings of fact to the contrary and issue an amended opinion consistent with the evidence. To the degree that these points are not clear, the Court should schedule oral argument on this motion to allow the parties to fully explain their theories.

WHEREFORE, The United States respectfully requests that the Court amend the findings of fact to award judgment in favor of the United States as set out in the United States' Proposed Findings of Fact and Conclusions of Law.

Dated: December 22, 2008          Respectfully submitted,

RONALD J. TENPAS
Assistant Attorney General
Environment and Natural Resources
    Division

15

JAMES R. MacAYEAL
STEVEN O'ROURKE
Environmental Enforcement Section
Environment and Natural Resources
Division
United States Department of
    Justice
P.O. Box 7611
Washington, D.C.  20044-7611
(202) 616-8777
Fax: (202) 514-2583

MICHELLE T. DELEMARRE
Torts Branch, Civil Division
U.S. Department of Justice
Post Office Box 14271
Washington, D.C.  20044-4271
(202) 616-4037
Fax: (202) 616-4159

R. ALEXANDER ACOSTA
United States Attorney
WENDY JACOBUS
Chief, Civil Division
Southern District of Florida
99 N.E. 4th Street
Miami, FL  33132
(305) 961-9000

OF COUNSEL:

SHEILA O'BRIEN
NOAA, General Counsel, SE
263 13th Ave. S.
Suite 177
St. Petersburg, FL 33701

Certificate of Service

I hereby certify that on December 22, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties so identified on the attached service list in the manner specified, either via transmission of Notices of Electronic Filing generated by CM-/EFC or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

All of the below are being served using CM/ECF:

Attorneys for Defendants

Andrew W. Anderson, Esq.
Ryon L. Little, Esq.
200 South Biscayne Blvd, Suite 300
Miami, Florida  33131-2332
(305)372-9044 Telephone
(305) 372-5055 Facsimile

_____
James R. MacAyeal